Filed 11/30/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JANE DOE, a Minor, etc., <br><br>     Plaintiff and Appellant, <br><br>     v. <br><br> LAWNDALE ELEMENTARY SCHOOL DISTRICT et al., <br><br>     Defendants and Respondents. | B305551 <br><br> (Los Angeles County Super. Ct. No. BC686649) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Deirdre Hill, Judge. Reversed with directions.

Esner, Chang & Boyer, Holly N. Boyer, Shea S. Murphy, Kevin K. Nguyen; Taylor & Ring, David M. Ring and Brendan P. Gilbert for Plaintiff and Appellant.

Tyson & Mendes, Susan L. Oliver, Raymond K. Wilson, Jr., and Emily S. Berman for Defendants and Respondents.

# INTRODUCTION

When Jane Doe was 13 years old, 26-year-old Jason Farr, an employee of Lawndale Elementary School District and a music instructor at Doe's school, sexually assaulted her. Doe sued the District for negligence and for breach of the mandatory duty to report suspected abuse under the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.) (CANRA). The trial court granted the District's motion for summary judgment, ruling the District did not have a duty to protect Doe from sexual abuse unless it knew Farr had previously engaged in sexual misconduct with minors or had a propensity to do so. The court also ruled that, because Farr's conduct was "ambiguous," it did not give rise to a duty of care and that there were no triable issues of material fact regarding whether the District knew about Farr's misconduct. Finally, the court ruled Doe could not prevail on her cause of action for violation of CANRA because none of the District's employees knew or reasonably suspected Farr had abused her.

We conclude, consistent with California negligence law, that school administrators have a duty to protect students from sexual abuse by school employees, even if the school does not have actual knowledge of a particular employee's history of committing, or propensity to commit, such abuse. Therefore, we reverse the trial court's order granting summary adjudication on Doe's negligence causes of action. But we also conclude, as a matter of first impression, that a plaintiff bringing a cause of action for breach of the mandatory duty to report suspected abuse under CANRA must prove it was objectively reasonable for a mandated reporter to suspect abuse based on the facts the

2

reporter actually knew, not based on facts the reporter reasonably should have discovered. Because Doe did not create a triable issue of material fact regarding whether any of the District's employees knew of facts from which a reasonable person in a like position could suspect abuse, we affirm the trial court's order granting summary adjudication on Doe's CANRA cause of action.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Farr Grooms Doe for Several Months, Then Sexually Assaults Her*

When Doe was a seventh-grade student in one of the District's schools, she participated in the school's band program during regular school hours. Farr, an employee of the District, oversaw an afterschool program at the school called Realizing Amazing Potential (RAP) that gave students the opportunity to practice music in the band room and do homework in classrooms. After meeting Doe, Farr convinced her to join RAP. At the end of the academic year, Doe also joined the summer RAP program, which met on weekdays. Farr was an instructor in the summer RAP program.

After Doe joined RAP, Farr began to groom her for sexual abuse.[1] Farr found Doe's profile on a social media application

---

[1] "Sexual grooming consists of planning and deliberate behaviors to befriend and establish an emotional connection with a child to have the child lower and abandon whatever inhibitions the child might have against inappropriate sexual activities." (*Los Angeles County Dept. of Children & Family Services v.*

3

and began to send her messages. After Farr told Doe he had intimate feelings for her, they began to talk on the phone. Farr also attended Doe's band class during regular school hours to be near her (even though he was not a teacher in the class). He spent time with Doe on the school campus, including time alone with her in the band room. He hugged her, played with her hair, and tickled her.

Eventually Farr began kissing Doe when they were alone together in the band room. In the fall of Doe's eighth-grade academic year, Farr had sexual contact with Doe, which included genital touching and oral sex. Farr continued to sexually abuse Doe until at least the spring of that academic year, when Doe's stepfather learned of the abuse. In March 2017 Farr was arrested; he ultimately pleaded guilty to oral copulation of a person under the age of 16.

> B. *Doe Files This Action Against the District, and the District Moves for Summary Judgment*

Doe filed this action against the District and Farr (who is not a party to this appeal). Doe asserted two causes of action for negligence—one based on negligent hiring, supervision, and retention of Farr, and one based on negligent supervision of Doe. Doe also asserted a cause of action for breach of the mandatory

---

*Superior Court* (2013) 222 Cal.App.4th 149, 158; see *People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1330-1331 (conc. opn. of Rubin, J.) ["Under a phenomenon . . . described as 'grooming,'" a child molester, by "sexualizing a child with sexual banter and other conduct short of touching, . . . can prepare the child to be receptive to more direct sexual contact down the road."].)

4

duty to report suspected child abuse under Penal Code section 11166.

The District moved for summary adjudication on each of Doe's causes of action and for summary judgment. For the negligence causes of action, the basis of the District's motion was not clear. Despite setting forth the applicable standard—that the District was entitled to summary adjudication if it showed Doe could not establish "one or more elements of [her] cause of action"—the District did not state in its motion which element(s) the District was claiming Doe could not establish. It appears, however, the District was arguing it had no duty to protect Doe from sexual abuse by Farr.[2] The District argued that it could not be liable for failing to supervise Doe and Farr unless and until it had "actual knowledge" of Farr's abuse of Doe or of "prior sexual misconduct by [Farr]" and that it was undisputed none of the District employees knew Farr sexually abused Doe or anyone else until the police arrested Farr. The District also argued that Farr's conduct was "ambiguous" and that it could not be liable for failing to protect Doe from sexual abuse if it knew only about conduct by Farr the District claimed was "ambiguous." Therefore, according to the District, it "had no duty or ability to supervise [Doe] at the time the[ ] alleged sexual acts occurred." For Doe's cause of action for breach of the mandatory duty to report suspected child abuse, the District contended Doe could not show that any District employee knew or reasonably suspected Farr had sexually abused Doe.

---

[2]     The District never used the word "causation" or "damages" in its motion, and the only time the District used the word "breach" was in connection with Doe's cause of action for breach of the mandatory duty to report suspected child abuse.

5

In opposition to the motion, Doe argued that, because school districts have a special relationship with their students, the District had an ongoing duty to protect Doe from foreseeable harm, including sexual abuse, and that therefore the District's duty was not "triggered *only* upon actual knowledge of a sexual relationship." Regarding her cause of action for breach of the mandatory duty to report suspected child abuse, Doe argued the applicable standard was not whether District employees in fact knew or suspected Farr had abused Doe, but whether they "*should have* formed a suspicion of child abuse and reported such suspicions."

Doe also submitted evidence she asserted showed the District failed to take reasonable steps to prevent Farr from abusing her. She submitted deposition testimony from several of her peers who had observed Farr's behavior. Several students stated that Farr was always with Doe at school and that he always sat or stood next to her during band practice (the program Farr did not teach). Several students said that Farr and Doe regularly "flirted" with each other and that Farr frequently tickled and hugged Doe and played with her hair. Multiple students stated that Doe sometimes rested her head on Farr's shoulder when he hugged her and that Doe wore Farr's jacket at school. According to one student, Doe became upset when Farr would not let her sit on his lap. The student also stated that she walked in on Doe and Farr alone together in the band room at least 20 times and that she felt as though she was "intruding on a couple." Another student witnessed disagreements between Doe and Farr where Doe would cry—interactions the student described as "girlfriend/boyfriend-type" behavior. By the late fall of Doe's eighth-grade year, most of the students in the RAP

6

program were talking about Farr's unusual behavior.  As one student stated, it was "obvious" to the students something was going on between Farr and Doe.

Doe also submitted a declaration from Dr. Robert Fraisse, a school administrator and former superintendent of several school districts, who stated that, during his 45-year career, he supervised and trained school administrators in the supervision of school staff.  According to Dr. Fraisse, the various interactions between Farr and Doe, as witnessed by Doe's classmates, were examples of "open and obvious" predatory behavior that "clearly gave rise to an appearance of impropriety."  In Dr. Fraisse's opinion, given the seriousness and frequency of Farr's behavior, Farr's supervisors failed "to spot[ ] and respond[ ] to red flags."  Dr. Fraisse also reviewed the deposition testimony of Farr's direct supervisor, Diana Villareal, who stated she only checked in on Farr's interactions with students about once a week.  In Dr. Fraisse's opinion, such supervision was insufficient, "particularly . . . given that Farr would be the only adult present with his students in enclosed structures, i.e., the band room."

In its reply, the District asserted boilerplate objections to essentially all of Dr. Fraisse's opinions, including that his opinions "lack[ed] foundation," were "[i]nadmissible speculation, conclusions and opinions," "misstate[d] [the] evidence presented," "assumed facts not in evidence," were "vague and ambiguous," and were "irrelevant."  The District did not provide any further argument in support of its objections.

C.    *The Trial Court Grants the District's Motion for*
      *Summary Judgment*

The trial court granted the District's motion for summary judgment.  The court, without explanation, also sustained the District's objections to Dr. Fraisse's declaration.[3]  Although the record is not entirely clear, the court appears to have ruled the District had a duty to protect Doe from sexual abuse only if it knew Farr had sexually abused minors previously or had a propensity to do so.  Agreeing with the District's argument and quoting *Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 719 (*Santillan*), the court ruled Farr's conduct, "'where one sense might suggest a tendency or propensity to engage in "unlawful sexual conduct" with a child, but where another sense might suggest innocent conduct or . . . wrongful conduct that did not involve a tendency or propensity to engage in "unlawful sexual conduct" with a child,'" was ambiguous and thus did not give rise to a duty to protect.  The court concluded the District met its burden to show there were no triable issues of fact because no one complained about Farr before

---

[3]    Because it is not necessary to our decision, we do not address the court's rulings on the District's boilerplate objections. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532-533 ["[A]ll 'too often' 'litigants file blunderbuss objections to virtually every item of evidence submitted.' . . .  [T]he parties—with the trial court's encouragement—should specify the evidentiary objections they consider important, so that the court can focus its rulings on evidentiary matters that are critical in resolving the summary judgment motion."]; *Cohen v. Kabbalah Centre Internat., Inc.* (2019) 35 Cal.App.5th 13, 21 ["objecting to every single thing with no display of professional judgment or restraint is an abusive practice"].)

he was arrested and no one witnessed Farr commit any "overt sexual act." Finally, the court, discussing the evidence of Farr's conduct at the school in the presence of others, ruled that Doe had failed to create a triable issue of material fact. The court entered judgment in favor of the District, and Doe timely appealed.

## DISCUSSION

### A. *Standard of Review*

"A court may grant a motion for summary judgment or summary adjudication 'only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."'" (*Doe v. The Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 668 (*Archbishop*); see Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).) "A defendant moving for summary adjudication of a cause of action must show that one or more elements cannot be established or that there is a complete defense." (*Clark v. Superior Court* (2021) 62 Cal.App.5th 289, 298; see *Mattei v. Corporate Management Solutions, Inc.* (2020) 52 Cal.App.5th 116, 122; *Regents*, at p. 618; *Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1005.)

Where, as here, "a defendant moves for summary adjudication on a cause of action for which the plaintiff has the burden of proof at trial, the defendant 'must present evidence that either "conclusively negate[s] an element of the plaintiff's cause of action" or "show[s] that the plaintiff does not possess, and cannot reasonably obtain," evidence necessary to establish at

9

least one element of the cause of action. [Citation.] Only after the defendant carries that initial burden does the burden shift to the plaintiff "to show that a triable issue of one or more material facts exists as to the cause of action . . . ."'" (*Archbishop*, *supra*, 70 Cal.App.5th at p. 668; see Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853-854.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850; accord, *Lares v. Los Angeles County Metropolitan Transportation Authority* (2020) 56 Cal.App.5th 318, 331-332.) We review a ruling on a motion for summary adjudication de novo (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273; *Regents of University of California v. Superior Court* (2018) 29 Cal.App.5th 890, 908) and "decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law" (*Mattei v. Corporate Management Solutions, Inc., supra*, 52 Cal.App.5th at p. 122; see *Regents*, *supra*, 4 Cal.5th at p. 618).

> B.  *The Trial Court Erred in Granting the District's Motion for Summary Adjudication on Doe's Negligence Causes of Action*

Doe contends the District had a special relationship with Doe and therefore a duty to take reasonable steps to protect her from foreseeable harm, including sexual abuse. The District concedes it had a special relationship with Doe, but argues that it did not have a duty to protect Doe from sexual abuse unless it had knowledge of "prior sexual misconduct by [Farr]" and that

10

the facts the District knew concerning Farr's conduct were "ambiguous at worst." As we explain, Doe's description of the District's duty—specifically, its administrators' duty to take reasonable measures to protect her—is correct. The District's proposed limitations on that duty, which the trial court appeared to rely on in granting the District's motion for summary judgment, are unsupported by the applicable law.

1. *School Administrators Have a Duty To Protect Students from Sexual Abuse and Other Intentional Tortious Conduct by School Employees*

"'To establish a cause of action for negligence, the plaintiff must show that the "defendant had a duty to use due care, that [it] breached that duty, and that the breach was the proximate or legal cause of the resulting injury." [Citation.] Recovery for negligence depends as a threshold matter on the existence of a legal duty of care.'" (*Archbishop, supra*, 70 Cal.App.5th at p. 669; see *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*); *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292.) "The existence of a duty is a question of law, which we review de novo." (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083; see *Regents, supra*, 4 Cal.5th at p. 620 ["The determination whether a particular relationship supports a duty of care rests on policy and is a question of law."].)

"A duty exists only if "'the plaintiff's interests are entitled to legal protection against the defendant's conduct.'"" (*Brown, supra*, 11 Cal.5th at p. 213; see *Archbishop, supra*, 70 Cal.App.5th at p. 669.) As the California Supreme Court explained in *Brown*, "[g]enerally, the 'person who has not created

11

a peril is not liable in tort merely for failure to take affirmative action to assist or protect another' from that peril." (*Brown*, at p. 214; see *Regents*, *supra*, 4 Cal.5th at p. 619.) "But this 'no-duty-to-protect rule' is not absolute." (*Archbishop*, at p. 670; see *Brown*, at p. 215.) "Under some circumstances, a defendant may have an affirmative duty to protect the plaintiff from harm at the hands of a third party, even though the risk of harm is not of the defendant's own making." (*Brown*, at p. 215; see *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235.) In particular, "a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm." (*Brown*, at p. 215; see *Regents*, at p. 619.) "'[A] typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare."'" (*Regents*, at p. 621; accord, *Dix v. Live Nation Entertainment, Inc.* (2020) 56 Cal.App.5th 590, 606; see *Brown*, at p. 220 [a special relationship "extends a right of recovery to individuals in relationships involving dependence or control, and who by virtue of those relationships have reason to expect the defendant's protection"].)

The District properly concedes it had a special relationship with Doe. "[A] school district and its employees have a special relationship with the district's pupils, a relationship arising from the mandatory character of school attendance and the comprehensive control over students exercised by school personnel, 'analogous in many ways to the relationship between parents and their children.'" (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 869 (*Hart*); see *Regents*, *supra*,

12

4 Cal.5th at p. 624; *D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 223; *M.N. v. Morgan Hill Unified School Dist.* (2018) 20 Cal.App.5th 607, 617.) "Because of this special relationship, imposing obligations beyond what each person generally owes others," the "duty of care owed by school personnel includes the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally," including "injuries to a student resulting from a teacher's sexual assault." (*Hart*, at p. 870; see *Regents*, at p. 624; *D.Z.*, at p. 223; *M.N.*, at p. 617; see also *Doe v. United States Youth Soccer* (2017) 8 Cal.App.5th 1118, 1129 (*United States Youth Soccer*) ["California courts have frequently recognized special relationships between children and their adult caregivers that give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties"].) Thus, the District's administrators had a duty to use reasonable measures to protect Doe from foreseeable injury caused by Farr's intentional conduct.[4]

---

[4] A public entity like the District is generally immune from liability, except as provided by statute. (Gov. Code, § 815, subd. (a).) But "public employees are liable for their acts and omissions 'to the same extent as a private person' [citation], and public entity employers are vicariously liable for employees' negligent acts within the scope of their employment to the same extent as private employers." (*Regents*, *supra*, 4 Cal.5th at p. 619.) Therefore, a public entity like the District may be liable "for the negligence of supervisory or administrative personnel . . . ." (*Hart*, *supra*, 53 Cal.4th at p. 865.)

### 2. *The* Rowland *Factors*

Once a court determines a defendant owes a duty to a plaintiff, "the remaining liability questions—breach as well as factual and legal causation—are usually questions for the jury." (*Brown, supra,* 11 Cal.5th at p. 228 (conc. opn. of Cuéllar, J.); see (*Vasilenko v. Grace Family Church, supra,* 3 Cal.5th at p. 1084 ["[b]reach, injury, and causation must be demonstrated on the basis of facts adduced at trial, and a jury's determination of each must take into account the particular context in which any act or injury occurred"].)  For example, a defendant's arguments "about specific measures it has already taken"—such as whether the District's administrators did enough to prevent Farr's sexual abuse—"concern[ ] whether defendant in fact took reasonable care, a question of breach usually for the jury."  (*Brown*, at pp. 230-231 (conc. opn. of Cuéllar, J.); see *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772 (*Cabral*).)  Similarly, "argument[s] about specific foreseeability"—such as whether Farr's sexual abuse of Doe was foreseeable under the circumstances—"would be relevant to whether plaintiff had established proximate cause, also usually a question for the jury." (*Brown*, at p. 231 (conc. opn. of Cuéllar, J.); see *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 198.)  "Most liability questions are case-specific and so not amenable to analysis in terms of duty—they do not allow a categorical determination whether defendant had to exercise reasonable care at all." (*Brown*, at p. 228 (conc. opn. of Cuéllar, J.); see *Cabral*, at p. 773, fn. 3 ["When no such categorical considerations apply and reasonable minds could differ about the competing risks and burdens or the foreseeability of the risks in a specific case, . . .

14

courts should not use duty and no-duty determinations to substitute their evaluation for that of the factfinder.'"].)

Nevertheless, "'[e]ven if an organization has a special relationship with the tortfeasor or plaintiff, "[t]he court may depart from the general rule of duty . . . if other policy considerations clearly require an exception."'" (*Archbishop*, *supra,* 70 Cal.App.5th at p. 673; see *Regents, supra*, 4 Cal.5th at p. 628; *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1095, affd. (2021) 11 Cal.5th 204.) As the Supreme Court explained in *Brown*, "whether a defendant has a legal duty to take action to protect the plaintiff from injuries caused by a third party" involves a two step-inquiry: "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in [*Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*)] to determine whether relevant policy considerations counsel limiting that duty." (*Brown*, *supra*, 11 Cal.5th at p. 209.)

"The *Rowland* factors are "'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.'"" (*Archbishop, supra*, 70 Cal.App.5th at pp. 673-674; see *Brown, supra*, 11 Cal.5th at p. 217; *Regents, supra*, 4 Cal.5th at p. 628.) "In considering [the

*Rowland* factors], we determine 'not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.'" (*Regents*, at p. 629; see *Brown*, at p. 221.) Thus, a court considers the *Rowland* factors "'at a relatively broad level of factual generality.'" (*Brown*, at p. 221.)

> 3.     *The Trial Court Erred by Limiting the District's Duty Without Conducting an Analysis of the* Rowland *Factors*

As discussed, the trial court ruled that the District did not have a duty to protect Doe from sexual abuse unless the District had actual knowledge Farr previously engaged in, or had a propensity to engage in, sexual misconduct with minors and that the conduct the District did know about was too "ambiguous" to give rise to a duty of care. The District, however, did not argue in the trial court that the *Rowland* factors supported this limitation. In fact, the District's only mention of *Rowland* in the trial court was in its reply brief, where the District stated, contrary to well-established law, that the *Rowland* factors were inapplicable to the court's analysis of the District's duty. The trial court similarly did not analyze or even mention the *Rowland* factors. The trial court erred.

Although the trial court's ruling is not entirely clear, it appears the court relied primarily on *Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675 (*Doe v. DCFS*). In that case a woman who lived in a foster home when she was a minor sued the child protective agency and the private foster care agency who placed her with a foster parent

16

whose sons sexually abused her. (*Id.* at pp. 679-680.) The court held that, notwithstanding the agency's special relationship with the plaintiff, the agency did not have a duty to protect her from the sexual abuse because the agency did not know that the plaintiff had contact with the sons (who were adults at the time of the abuse) or that they had a propensity for sexual abuse. (*Id.* at p. 686.) While discussing the foster care agency's duty, the court in *Doe v. DCFS* quoted a passage from *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068 (*Romero*)—also cited by the District—where the court (in *Romero*) stated: "In addition to the special relationship . . . there must also be evidence showing facts from which the trier of fact could reasonably infer that the [defendant] had prior *actual knowledge*, and thus *must have known*, of the offender's assaultive propensities." (*Romero*, at p. 1084; see *Doe v. DCFS*, at p. 682.)

But in the passage cited by the court in *Doe v. DCFS*, the court in *Romero* was analyzing the scope of the duty created by the special relationship in that case, namely, the relationship between adults and the minors they host in their homes (such as friends of their children). In *Romero* a 16-year-old boy sexually assaulted a 13-year-old girl while they were both visiting the home of another teenager. (See *id.* at p. 1072.) The girl sued the host parents, contending they failed to protect her from sexual abuse. (*Id.* at p. 1076.) After concluding the host parents had a special relationship with the girl, the court in *Romero* held "sound public policy requires that where one invitee minor sexually assaults another in the defendant's home, the question of whether the defendant owed a duty of reasonable care to the injured minor depends on whether the assailant minor's conduct was *reasonably foreseeable,* but that conduct will be deemed to

17

have been reasonably foreseeable only if the defendant had *actual knowledge* of the assaultive propensities of the teenage assailant." (*Id.* at p. 1081.) The court in *Romero* stated that to hold otherwise would "impose unwarranted burdens and an unjustifiable risk of tort liability on families with teenage children" so that "[p]arents possessing any information suggesting that a teenager that they or their own children may wish to invite into the home . . . would be required to conduct an investigation in order to protect themselves against potential liability" and "would be hampered in their investigative efforts by legitimate and well-established rules of confidentiality regarding juvenile matters." (*Id.* at p. 1083.)

To the extent *Doe v. DCFS* suggests that, in all cases where a defendant has a special relationship with a plaintiff, the defendant has a duty to protect the plaintiff from third-party assaults or abuse only if the defendant has actual knowledge of the third party's propensity for assault or abuse, California law does not support such a proposition. As one court stated in declining to extend the holding in *Romero* to the duty arising from the special relationship between school districts and students: "The public policy reasons surrounding the *Romero*[ ] rule do not exist in the context of a school district's supervisory responsibilities. Simply put, the school grounds provide a different setting than an adult's home. And there are differing public policy concerns related to the responsibilities of school districts that provide mandatory education as compared to adults who invite children into their home on a voluntary basis." *(M.W. v. Panama Buena Vista Union School Dist.* (2003) 110 Cal.App.4th 508, 524.)

To apply the holding of *Romero* to claims by students against school districts would also be inconsistent with the two-step inquiry confirmed by the Supreme Court in *Brown*:  After the court determines there is a special relationship, the court must "consider whether the policy considerations set out in *Rowland* warrant a departure from that duty *in the relevant category of cases*."  (*Brown, supra*, 11 Cal.5th at p. 222, italics added.)  Moreover, *Romero* "was decided before the Supreme Court's more recent decisions making clear that, when determining whether the defendant has a duty, such case-specific questions are not the right ones to ask.  As the Supreme Court explained in *Regents*, 'case-specific foreseeability questions are relevant in determining the applicable standard of care or breach in a particular case.  They do not, however, inform our threshold determination that a duty exists.'" (*Archbishop, supra*, 70 Cal.App.5th at p. 677; see *Regents, supra*, 4 Cal.5th at p. 630; see also *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143-1144 ["[b]ecause a judicial decision on the issue of duty entails line drawing based on policy considerations," we ask "'whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy'"]; *Cabral, supra*, 51 Cal.4th at p. 772 [same].)

The trial court also relied on *Santillan, supra,* 202 Cal.App.4th 708 in ruling that Farr's conduct was too ambiguous to give rise to a duty on the part of the District to protect Doe from sexual abuse.  *Santillan*, however, was not a duty case.  *Santillan* involved Code of Civil Procedure section 340.1, subdivision (a), which "extends the statute of limitations within which a victim of childhood sexual abuse may sue a person or entity who did not perpetrate the abuse but was a legal cause

19

of it." (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 536.) Prior to 2020, Code of Civil Procedure section 340.1, subdivision (b), "require[d] that such actions be brought before the victim's 26th birthday, unless the defendant 'knew or had reason to know, or was otherwise on notice, of any unlawful sexual conduct by an employee, volunteer, representative, or agent, and failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by that person . . . .'" (*Doe v. City of Los Angeles*, at p. 536; see Code Civ. Proc., § 340.1, former subd. (b)(2), added by Stats. 2002, ch. 149, § 1, and amended by Stats. 2019, ch. 861, § 1, eff. Jan. 1, 2020.)[5] The court in *Santillan* held Code of Civil Procedure section 340.1 "preclude[d] a finding of notice . . . based solely on an employer's or principal's knowledge of ambiguous conduct by the perpetrator." (*Santillan*, at p. 721.) But the court's holding was limited to a defendant's notice for purposes of extending the limitations period under the statute.[6]

---

[5]    The Legislature has since amended Code of Civil Procedure section 340.1 to allow victims to bring actions before their 40th birthday (see Code Civ. Proc., § 340.1, subds. (a) & (c)) and has broadened the scope of the tolling provision so that it applies where the defendant "knew or had reason to know, or was otherwise on notice, of any misconduct that creates a risk of childhood sexual assault by an employee" (*id.*, § 340.1, subd. (c)).

[6]    Citing *Federico v. Superior Court* (1997) 59 Cal.App.4th 1207, the court in *Santillan* stated that an employer's liability for its "employee's sexual abuse of minors" cannot be "based solely on knowledge of conduct by the employee which is ambiguous in regard to his commission of such offenses." (*Santillan, supra,* 202 Cal.App.4th at p. 720.) *Federico*, however, did not involve a

20

4. *The* Rowland *Factors Do Not Support Limiting the District's Duty To Protect Its Students from Sexual Abuse*

As with all defendants moving for summary adjudication or summary judgment, the District had the burden to show Doe could not establish the element of duty because the *Rowland* factors supported an exception to the District's general duty of care. (*Archbishop, supra*, 70 Cal.App.5th at pp. 674-675; see *Morris v. De La Torre* (2005) 36 Cal.4th 260, 277.) As stated, the District did not address the *Rowland* factors or argue they justified limiting the District's duty of care, thus failing to meet its moving burden. But even if the District had raised the issue, the *Rowland* factors do not weigh in favor of limiting the District's duty to protect students from sexual abuse by teachers and other school employees as the District proposes: to cases where school administrators have actual knowledge of prior sexual misconduct by the teacher or employee and where sexual misconduct is not "ambiguous."

a. *Foreseeability Factors*

"The *Rowland* factors fall into two categories. The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant." (*Regents, supra*, 4 Cal.5th at p. 629; see *Archbishop, supra*, 70 Cal.App.5th

___

duty to prevent abuse arising from a special relationship; thus, the case has little if any applicability here. (See *Hart, supra*, 53 Cal.4th at p. 877 ["the potential legal responsibility of [school district] administrators and supervisors for negligently hiring or retaining [employees] arises from the special relationship they had with plaintiff, a student under their supervision"].)

21

at p. 674.) "'The most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care . . . is whether the injury in question was *foreseeable*.'" (*Regents*, at p. 629; see *Kesner v. Superior Court*, *supra*, 1 Cal.5th at p. 1145; *Dix v. Live Nation Entertainment, Inc.*, *supra*, 56 Cal.App.5th at p. 611.)

*Foreseeability*. The District argues Farr's sexual abuse of Doe was not foreseeable because there were "no red flags in his background, or in his conduct and interactions with students . . . ." Putting aside that the District's argument ignores Farr's frequent physical interactions with Doe on campus in the presence of others—which the other middle school students described as "flirting"—the District's analysis is legally incorrect. "In examining foreseeability, 'the court's task . . . "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed."'" (*Regents*, *supra*, 4 Cal.5th at p. 629; see *id.* at p. 630 ["[w]hether a university was, or should have been, on notice that a *particular* student posed a foreseeable risk of violence is a case-specific question, to be examined in light of all the surrounding circumstances," which does "not inform our threshold determination that a duty exists"].) Thus, the issue is not whether it was reasonably foreseeable Farr's conduct would injure Doe, but whether it is reasonably foreseeable the failure of school administrators to take reasonable measures to prevent

22

sexual abuse will injure students.  The District does not address this issue.

The District also contends it is not foreseeable school employees will sexually abuse students.  According to the District, "sexual abuse is so unforeseeable that it is outside the course and scope of everyone's employment as a matter of law."  But a school district is not like every employer.  As the court recognized in *United States Youth Soccer*, *supra*, 8 Cal.App.5th 1118, sexual abuse by members "of an organization that provide[s] activities exclusively for children"—like an elementary school district—is reasonably foreseeable, even where the organization "had no knowledge that [the employee] had previously sexually or physically abused anyone or had a propensity to do so."  (*Id.* at pp. 1132, 1135; see *Archbishop*, *supra*, 70 Cal.App.5th at pp. 676-677; *Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th at pp. 1097-1098; *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 404 (*Juarez*), disapproved on another ground in *Brown, supra*, 11 Cal.5th at p. 222, fn. 9.)

The District relies primarily on *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438.  In that case the Supreme Court held a school district was not vicariously liable for a teacher's sexual molestation of a student under respondeat superior.  (*Id.* at p. 441.)  The lead opinion, joined by one other justice, included a footnote stating it was "unduly pessimistic . . . to suggest that sexual misconduct is foreseeable any time a minor and an adult are alone in a room together . . . ."  (*Id.* at p. 450, fn. 9.)  But the issue here is not whether it is foreseeable a particular adult will sexually abuse a student if left alone with the student.  As the court recognized in *United States Youth*

23

*Soccer*, and as subsequent cases confirmed, the issue is whether it is reasonably foreseeable that organizations or entities that provide services primarily or exclusively for children have employees who may sexually abuse a child if the organization fails to take reasonable measures to prevent the abuse. In any event, to the extent *John R.* suggests sexual abuse of students by school employees is not reasonably foreseeable, it is inconsistent with the Supreme Court's more recent holding in *Hart* that school personnel owe students a duty to take reasonable measures to protect them from foreseeable injury, including "injuries to a student resulting from a teacher's sexual assault." (*Hart*, *supra*, 53 Cal.4th at p. 871.)

*Certainty*. "The second factor, 'the degree of *certainty* that the plaintiff suffered injury' [citation], may come into play when the plaintiff's claim involves intangible harm, such as emotional distress." (*Regents*, *supra*, 4 Cal.5th at p. 630; accord, *Archbishop*, *supra*, 70 Cal.App.5th at p. 678.) This factor does not warrant limiting claims, like Doe's, based on physical sexual abuse and assault. In addition, even where a plaintiff seeks to recover for emotional distress from such abuse, "courts have recognized that the ""significant emotional trauma caused by childhood sexual abuse . . . is well documented.""" (*Archbishop*, at p. 678; see *Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th at p. 1098.)

*Connection with defendant's conduct*. "The third factor is 'the *closeness of the connection* between the defendant's conduct and the injury suffered.' [Citation.] 'Generally speaking, where the injury suffered is connected only distantly and indirectly to

24

the defendant's negligent act, the risk of that type of injury from the category of negligent conduct at issue is likely to be deemed unforeseeable. Conversely, a closely connected type of injury is likely to be deemed foreseeable.'" (*Regents*, *supra*, 4 Cal.5th at pp. 630-631; see *Cabral*, *supra*, 51 Cal.4th at p. 779.)

The question is whether, as Doe contends, school administrators may be liable when they fail to take reasonable measures to identify and respond to signs of potential sexual abuse of students by employees or whether, as the District contends, they may not be liable unless they know an employee has already engaged in (unambiguous) sexual misconduct. While the connection between an administrator's actions—or here, inaction—and subsequent sexual abuse is closer in the latter situation, it is not distant or indirect in the former. A school district that fails to reasonably supervise employees and students increases the likelihood that an employee will sexually abuse a student. (See, e.g., *Archbishop*, *supra*, 70 Cal.App.5th at p. 679 ["the failure to implement policies to prevent the sexual abuse of minors . . . increased the likelihood priests would abuse children attending afterschool classes"]; *Brown v. USA Taekwondo, supra*, 40 Cal.App.5th at p. 1099 [governing body's "failure to take any steps . . . to prevent taekwondo coaches from sexually abusing female athletes is closely connected to the injury [athletes] suffered" because the governing body "could have reduced the risk of [athletes] being abused by limiting inappropriate contact between coaches and youth athletes"]; *Doe 1 v. City of Murrieta* (2002) 102 Cal.App.4th 899, 914, 916 [police department's failure to restrict contact between a program's participants and officers by, for example, prohibiting officers from "spending an unusual amount of time" with participants and "going on frequent one-on-

one ride-alongs late at night" contributed to the likelihood that officers and the plaintiffs would become sexually involved], disapproved on another ground in *Brown*, *supra*, 11 Cal.5th at p. 222, fn. 9; *Juarez, supra*, 81 Cal.App.4th at p. 406 [Boy Scouts' failure to educate scouts, their parents, and adult volunteers to protect scouts from sexual abuse created "a sufficient causal link between the acts or omissions of the Scouts and the harm [the plaintiff] suffered"].)

### b. *Policy Factors*

"Even if the foreseeability factors under *Rowland* do not support an exception to the duty of care, we must also consider whether public policy considerations do." (*Archbishop*, *supra*, 70 Cal.App.5th at p. 679; see *Regents, supra*, 4 Cal.5th at p. 631.) "'A duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.'" (*Regents*, at p. 631; see *Vasilenko v. Grace Family Church*, *supra*, 3 Cal.5th at pp. 1086-1087.)

*Moral blame.* When considering whether school administrators may be liable for sexual abuse of students by employees, the Supreme Court in *Hart* stated: "Unless the individual alleged to be negligent in a hiring or retention decision knew or should have known of the dangerous propensities of the employee who injured the plaintiff, there is little or no moral blame attached to the person's action or inaction. And unless the employee's propensities posed a substantial risk of personal injury to the plaintiff or others in the same circumstances, there

is again little moral blame to assign . . . ." (*Hart*, *supra*, 53 Cal.4th at p. 877.)

Six years later, in *Regents*, the Supreme Court, considering whether college administrators may be liable for on-campus assaults by students on other students, explained that it had "'previously assigned moral blame, and . . . relied in part on that blame in finding a duty, in instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue.'" (*Regents, supra*, 4 Cal.5th at p. 631; see *Kesner v. Superior Court*, *supra*, 1 Cal.5th at p. 1151.) The Supreme Court in *Regents* also acknowledged that, although "adult students can no longer be considered particularly powerless or unsophisticated," "[s]ome measure of *moral blame* does attach to a university's negligent failure to prevent violence against its students" because, "compared to students, colleges will typically have access to more information about potential threats and a superior ability to control the environment and prevent harm." (*Regents*, at pp. 631-632.)

Secondary school students, even more than college students, are considerably more vulnerable and unsophisticated than school administrators. (See *Regents*, *supra*, 4 Cal.5th at p. 625 [college "[s]tudents are comparatively vulnerable and dependent on their colleges for a safe environment"].) And school districts certainly exercise a greater degree of control over the risks posed by school employees than middle school students do. (See *Hart*, *supra*, 53 Cal.4th at p. 869 [recognizing the "comprehensive control over students exercised by school personnel"]; *J.H. v. Los Angeles Unified School Dist.* (2010)

27

183 Cal.App.4th 123, 142 ["parents place trust in school to supervise their children"].)

In light of the disparity between school administrators and minor students in knowledge and control over the school environment, and the trust parents place in schools to protect their children, school administrators who fail to prevent sexual abuse are not absolved of moral responsibility simply because they did not have "actual knowledge" an employee previously engaged in sexual misconduct. Nor should administrators ignore signs of grooming or misconduct simply because someone untrained in the signs of sexual abuse perceives the conduct as "ambiguous." Administrators who fail to notice, identify, and respond to warning signs that suggest an employee is sexually abusing or will sexually abuse a student bear some moral responsibility for the abuse. (See *Archbishop*, *supra*, 70 Cal.App.5th at p. 680 [attributing "some moral blame" to a church "because it took only minimal action to prevent sexual abuse by priests, even after receiving dozens of reports of abuse"]; *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1329 [attributing "some degree of moral blame" to a school district that failed to prevent a special needs student from sexually assaulting another special needs student because the district "could have easily prevented . . . this occurrence from happening in the area by simply blocking access thereto"]; see also *Brown v. USA Taekwondo, supra*, 40 Cal.App.5th at p. 1100; *Doe 1 v. City of Murrieta, supra*, 102 Cal.App.4th at p. 916.)

*The policy of preventing future harm.* "'The overall *policy* of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible. The policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability.'" (*Regents, supra*, 4 Cal.5th at p. 632; see *Cabral, supra*, 51 Cal.4th at pp. 781-782.) Safeguarding children from sexual abuse—"[o]ne of society's highest priorities" (*Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1078-1079)—weighs strongly in favor of imposing a duty on school districts to take reasonable measures to identify and respond to potential misconduct, even before a district knows a specific employee has previously engaged in sexual misconduct. (See *Hart, supra*, 53 Cal.4th at p. 878; *Archbishop, supra*, 70 Cal.App.5th at pp. 680-681; *United States Youth Soccer, supra*, 8 Cal.App.5th at p. 1137; *Juarez, supra*, 81 Cal.App.4th at p. 407.)

On the other hand, in *Hart* the Supreme Court discussed the "undesirable consequences that could flow from imposing . . . liability on public school districts for sexual misconduct by teachers . . . ." (*Hart, supra*, 53 Cal.4th at p. 878.) These included "'the diversion of needed funds from the classroom to cover claims,'" the "likelihood districts would be deterred 'from encouraging, or even authorizing, extracurricular and/or one-on-one contacts between teachers and students,'" and "the possibility that unsubstantiated rumors of sexual misconduct might curtail or destroy the careers of innocent teachers, counselors or other employees." (*Ibid.*) Yet, after acknowledging these concerns, the Supreme Court in *Hart* held that "the value of negligence actions

29

in providing compensation to injured [students] and preventing future harm of the same nature" outweighed the potential undesirable consequences of imposing tort liability and that "these remedial goals are best addressed 'by holding school districts to the exercise of due care' in their administrators' and supervisors' 'selection of [instructional] employees and the close monitoring of their conduct . . . .'" (*Ibid*.) In the school context, such monitoring may include implementing reasonable measures to keep track of employee-student interactions to identify potentially problematic situations and inappropriate relationships, even before school administrators know a specific employee has engaged in sexual misconduct.

Citing *Steven F. v. Anaheim Union High School Dist.* (2003) 112 Cal.App.4th 904, the District raises the specter of additional undesirable consequences that could result if the law required school districts to take reasonable steps to prevent sexual abuse. In *Steven F.* two parents sued a school district, seeking to recover damages for their emotional distress after they discovered a teacher had sexually abused their daughter. (*Id.* at p. 906.) The court held the parents could not recover under a theory of negligent infliction of emotional distress because the parents were neither bystanders nor direct victims of the district's alleged negligence and because the other teachers' failure to report their colleague's suspicious conduct was not sufficiently outrageous. (*Id.* at pp. 911, 913.) Although not necessary to its decision, the court in *Steven F.* stated: "[A] policy of prevention of this sort of harm would require turning the culture at every high school in the district into a virtual police state . . . [¶] . . . It would be a reign of terror. . . . Teachers would be forced to be spies on their fellow teachers, with pain of discipline if they didn't. Mandatory

30

tattling. Student-teacher camaraderie would not only suffer, but would have to be virtually outlawed. No hugging, ever. No being in the same room alone, ever. No unchaperoned rides in a teacher's car, ever. No gifts, ever. Policies or guidelines counseling teachers not to give rides to students would be made absolute, without allowance for the possibility of human compassion, sickness, or rain. From the point of view of students and teachers the rule would be: Assume the worst. Any possibility of student-teacher friendship would be sacrificed on the altar of risk aversion." (*Id.* at p. 918.)

This language from the 2003 Court of Appeal opinion in *Steven F.* no longer reflects California law. Imposing liability on school administrators who fail to take reasonable measures to identify and respond to potential sexual abuse of students does not lead to the parade of horribles conjured by the court in *Steven F.* The language cited by the District is also inconsistent with the Supreme Court's 2012 decision in *Hart*, which weighed the consequences of imposing liability on school districts and held school administrators may be liable for their negligent supervision of employees that results in sexual abuse. (*Hart, supra*, 53 Cal.4th at p. 879.)

*Burden.* We also consider "the *burden* that recognizing a tort duty would impose on the defendant and the community." (*Regents, supra*, 4 Cal.5th at p. 633.) Limiting the District's duty of care as the District proposes would be less burdensome on school administrators than requiring administrators to take measures to proactively prevent sexual abuse. But Doe submitted evidence the District already has policies in place to detect and prevent sexual abuse of students by teachers. The

principal of Doe's school testified at his deposition that the school trains staff to recognize the signs of sexual abuse, maintain appropriate parameters in adult-student relationships, and impose safeguards such as keeping classroom doors open when students are present. And Farr's RAP supervisor testified she trained RAP program leaders on how to maintain professional relationships with students and on what type of physical interactions were appropriate. Imposing a duty to prevent sexual abuse of minors is less burdensome where an organization has already implemented policies to prevent such abuse. (See *Archbishop, supra,* 70 Cal.App.5th at pp. 681-682; *Brown v. USA Taekwondo, supra,* 40 Cal.App.5th at p. 1101; *Juarez, supra,* 81 Cal.App.4th at p. 408; see also *Dix v. Live Nation Entertainment, Inc., supra,* 56 Cal.App.5th at p. 614 [there was no reason to create an exception to a music festival operator's duty to attendees where the operator had "already recognized the risks and undertaken the burden to provide security measures and medical care"].)

*Insurance.* The final *Rowland* factor "is the *availability of insurance* for the risk involved." (*Regents, supra*, 4 Cal.5th at p. 633; see *Brown v. USA Taekwondo, supra*, 40 Cal.App.5th at p. 1101.) The District does not discuss whether it has obtained, or whether school districts are able to obtain, insurance to cover claims arising from sexual misconduct by teachers. This factor does not weigh for or against the District's proposed limitation. (See *United States Youth Soccer, supra*, 8 Cal.App.5th at pp. 1137-1138.)

\* \* \*

Thus, the *Rowland* factors do not weigh in favor of limiting school administrators' duty to prevent sexual abuse to circumstances where administrators know a specific instructor previously engaged in sexual misconduct and where the misconduct is not "ambiguous." Whether the measures the District took to prevent sexual abuse of students and to supervise Farr and Doe were reasonable is a case-specific question of breach. (See *Regents*, *supra*, 4 Cal.5th at p. 634 ["a duty of care is not the equivalent of liability"].) And it is a question for the jury, not the court on summary judgment. (See *Vasilenko v. Grace Family Church*, *supra*, 3 Cal.5th at p. 1084.)[7]

C. *The Trial Court Did Not Err in Granting Summary Adjudication on Doe's Cause of Action for Breach of the Mandatory Duty To Report Suspected Child Abuse*

CANRA requires a "mandated reporter," which includes teachers and certain other school employees, "to make a report to a law enforcement agency or a county welfare department 'whenever the mandated reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect.'" (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 186 (*B.H.*); see Pen. Code, § 11165.7.) Failure to make the

---

[7] To the extent the trial court ruled there was no breach as a matter of law because the District adequately supervised Farr and Doe, the ruling appears to have been based on the same mistaken conclusion that the District did not have a duty to protect Doe from sexual abuse unless it had actual knowledge of prior sexual misconduct by Farr.

required report is a misdemeanor. (Pen. Code, § 11166, subd. (c).) In addition, an injured minor may bring a civil action where "'a breach of the mandated reporter's duty to report child abuse'" causes the minor's injuries. (*B.H.*, at p. 189, fn. 6; accord, *All Angels Preschool/Daycare v. County of Merced* (2011) 197 Cal.App.4th 394, 405; see *Alejo v. City of Alhambra* (1999) 75 Cal.App.4th 1180, 1188 ["allegations [a] defendant failed to make the report required by the statute support[ ]" a cause of action "under the doctrine of negligence per se"], disapproved on another ground in *B.H.*, at p. 1289, fn. 6.)

The District employees who supervised Farr or observed him with Doe all testified that they never saw any interactions between Doe and Farr that caused them to suspect Farr was behaving inappropriately and that they did not learn Farr had sexually abused Doe until his arrest. The trial court ruled this evidence met the District's burden to show Doe could not prove the District breached a mandatory duty to report. Doe contends that, because CANRA provides for an objective, rather than a subjective, standard for mandated reporters, there was a triable issue of fact regarding whether District employees had a reasonable suspicion of abuse.

Doe is correct that CANRA employs an objective standard for evaluating the reasonableness of a mandated reporter's suspicion. Penal Code section 11166, subdivision (a)(1), states "'reasonable suspicion' means that it is objectively reasonable for a person to entertain a suspicion, based upon facts that could cause a reasonable person in a like position, drawing when appropriate, on the person's training and experience, to suspect child abuse or neglect." (See also *B.H.*, *supra*, 62 Cal.4th at p. 193 ["Mandated reporters have *mandatory* reporting duties

34

which are governed by an objective standard."].) But that does not answer the question here. The District contends that, although the statute imposes an objective standard, whether mandated reporters like teachers and school employees have a reasonable suspicion of abuse still depends on the facts actually known to them, not what they "should have known" had they "been paying attention." At oral argument counsel for Doe argued the "facts that could cause a reasonable person in a like position" to suspect abuse include not only the facts known to teachers and employees, but facts reasonable teachers or employees in a like position should have discovered. Thus, according to Doe, a mandated reporter like a District teacher breaches his or her mandatory duty to report suspected abuse if (1) he or she fails to discover facts that a reasonable person in a like position should have discovered and (2) those facts would have caused that reasonable person in a like position to suspect abuse.[8] The dispute here is over (1).

---

[8] Doe does not specifically make this argument in her opening brief. She argues only that "the same evidence implicating the District's affirmative duty to supervise" Farr and Doe under her negligence theory "provides the evidentiary basis for finding triable questions" regarding whether District employees "should have formed a reasonable suspicion of child abuse . . . ." This type of conclusory argument does not meet her burden on appeal to show error. (See *Tubbs v. Berkowitz* (2020) 47 Cal.App.5th 548, 554 ["Although we conduct a de novo review" of an order granting summary judgment, we still "'must presume the judgment is correct, and the appellant bears the burden of demonstrating error.'"].) But as we discuss, even considering Doe's new argument, Doe has not shown the trial court erred in granting summary adjudication on her cause of action for violation of Penal Code section 11166.

The District has the better argument. "'"When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.'"'" (*Hassell v. Bird* (2018) 5 Cal.5th 522, 540.)

As discussed, under Penal Code section 11166, subdivision (a)(1), "'reasonable suspicion' means that it is objectively reasonable for a person to entertain a suspicion, based upon facts that could cause a reasonable person in a like position," to suspect abuse. Reading this definition in isolation, it is not immediately clear whether the facts that could cause a reasonable person to suspect abuse are limited to the facts known to the person, or whether they include facts a reasonable person should have discovered. But considered in the context of other provisions of CANRA, the former interpretation is the correct one. (See *Hassell v. Bird*, *supra*, 5 Cal.5th at p. 540 ["'"We do not examine [statutory] language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment."'"'].)

First, CANRA requires mandated reporters "to report known or suspected instances of child abuse within expedited time frames" (*B.H.*, *supra*, 62 Cal.4th at p. 190) that begin when the mandated reporter "receiv[es] the information" (Pen. Code,

36

§ 11166, subd. (a)) suggesting a child has been the victim of abuse.  Penal Code section 11166, subdivision (a), provides that, when a mandated reporter knows or reasonably suspects a child has been the victim of abuse or neglect, the reporter "shall make an initial report by telephone" to one of the agencies specified in the statute "immediately or as soon as is practicably possible, and shall prepare and send, fax, or electronically transmit a written followup report within 36 hours of receiving the information concerning the incident."  The report must include "the information that gave rise to the reasonable suspicion of child abuse or neglect and the source or sources of that information." (*Id.*, § 11167, subd. (a); see *Mathews v. Becerra* (2019) 8 Cal.5th 756, 779.)  That the mandated reporter's duty to report begins to run when the reporter receives the information concerning the incident indicates the Legislature intended the phrase "facts that could cause a reasonable person in a like position . . . to suspect child abuse" (Pen. Code, § 11166, subd. (a)(1)) to refer to those facts known (i.e., received) by the reporter, not facts the reporter did not know but should have discovered.  A contrary interpretation would create difficulties in determining when the 36-hour deadline for the reporter to submit the written report commenced.[9]

---

[9]    The initial version of the statute introduced in the Senate required the mandated reporter to make a report of suspected abuse "within 36 hours," but it did not specify when the 36-hour deadline began to run.  (Sen. Bill No. 781 (1979-1980 Reg. Sess.) § 4, as introduced Mar. 23, 1979.)  The Assembly added the operative language clarifying that the 36 hours runs from when the reporter "receiv[es] the information concerning the incident." (Assem. Amend. to Sen. Bill No. 781 (1979-1980 Reg. Sess.) June 12, 1980; see Stats. 1980, ch. 1071, § 4.)

37

Second, CANRA differentiates between mandated reporters like teachers, who report suspected abuse, and government agencies, who investigate the reports of abuse. The statutory framework "'requires persons in positions where abuse is likely to be detected to report promptly all suspected and known instances of child abuse to authorities for follow-up investigation.'" (*B.H.*, *supra*, 62 Cal.4th at p. 190; accord, *Ferraro v. Chadwick* (1990) 221 Cal.App.3d 86, 90; see Pen. Code, §§ 11165.7, subd. (a), 11166, subd. (a).) But "'[o]nce a report is made, responsibilities shift and governmental authorities take over.'" (*B.H.*, at p. 190; see *James W. v. Superior Court* (1993) 17 Cal.App.4th 246, 254.) "The agency that receives the initial report must share the information with various other agencies. For example, law enforcement and county agencies are required to cross-report the information to each other, to child welfare agencies, and to district attorneys' offices." (*Mathews v. Becerra*, *supra*, 8 Cal.5th at p. 779; see Pen. Code, § 11166, subds. (j) & (k).) The provisions of CANRA also "encourage[ ] the agencies to continue to share information with each other throughout the investigation." (*Mathews*, at p. 779; see Pen. Code, § 11166.3, subd. (a).) "In this way, the statutory scheme sets up 'a dichotomy between reporter and reportee.'" (*B.H.*, at p. 190; see *James W.*, at p. 257.)

Doe's proposed interpretation of Penal Code section 11166, subdivision (a), would require mandated reporters to conduct an investigation—i.e., an investigation that a reasonable person in a like position would conduct (in the case of teachers, based on their duty to protect students from harm caused by third parties). This conflation of the duties of reporter and reportee, however, is inconsistent with the statutory scheme, which treats the two duties differently. (See *B.H.*, *supra*, 62 Cal.4th at p. 189

38

["In regard to investigating whether child abuse or neglect has occurred, the assessments of mandated reporters and the agencies receiving child abuse reports are not the same and are governed by different standards."].)  Whereas a mandated reporter's duty to report is governed by an objective standard, "the determinations of . . .  investigators about how to follow up on a report of a suspected incident of child abuse are governed by a subjective standard . . . ." (*Id.* at p. 192.)[10]

Third, while neither side has cited any authority on point, the Supreme Court has suggested that reasonable suspicion under CANRA is based on the facts actually known to the mandated reporter.  For example, in *B.H.*, *supra*, 62 Cal.4th 168 the Supreme Court stated "'the duty to report arises not on the basis of the mandated reporter's personal assessment of the facts known to her, but on the basis of what a reasonable person would suspect based on those facts.'"  (*Id.* at p. 193.)  "Those facts," in that line of the *B.H.* opinion, refers to "facts known to" the reporter.[11]  (See *People v. Davis* (2005) 126 Cal.App.4th 1416,

---

[10]    For example, "[s]ection 11165.12 defines [an investigator's] reports as unfounded, substantiated, or inconclusive in terms of the investigator's subjective findings." (*B.H.*, *supra*, 62 Cal.4th at pp. 192-193; see Pen. Code, § 11165.12, subds. (a)-(c).)

[11]    The Supreme Court in *B.H.* held CANRA "does not require a law enforcement officer conducting an investigation of an initial report of child abuse . . . to make additional reports about the same incident." (*B.H.*, *supra*, 62 Cal.4th at p. 186.)  The Supreme Court's comments about facts known by a mandated reporter may be dicta, but they're pretty good dicta.  (See *Southern California Edison Co. v. Severns* (2019) 39 Cal.App.5th 815, 829,

1427-1428 ["the history and interpretation of" CANRA "reflects an intent to mandate reports of suspected abuse if the facts known to the reporter would give rise to an objectively reasonable suspicion that abuse occurred"]; *People ex rel. Eichenberger v. Stockton Pregnancy Control Medical Clinic, Inc.* (1988) 203 Cal.App.3d 225, 239 [CANRA "makes clear that professionals subject to [CANRA] must evaluate facts known to them in light of their training and experience to determine whether they have an objectively reasonable suspicion of child abuse."].)

Finally, Penal Code section 11166 is a criminal statute that makes it a misdemeanor, punishable by up to six months in jail, for a mandated reporter to fail to make a required report. (Pen. Code, § 11166, subd. (c); see *B.H.*, *supra*, 62 Cal.4th at p. 188, fn. 6 ["The Legislature has . . . imposed criminal sanctions against mandated reporters for failing to report."].) Where "two reasonable interpretations of a penal statute stand in relative equipoise," courts "'resolve doubts as to the meaning of a statute in a criminal defendant's favor.'" (*People ex rel. Green v. Grewal* (2015) 61 Cal.4th 544, 565.) The competing interpretations of the statute proposed by Doe and the District do not stand in relative equipoise; the District's is better. But even if they did (i.e., stand in relative equipoise), the District's interpretation is both reasonable and more favorable to criminal defendants. Doe's interpretation would criminalize not only a mandated reporter's failure to make a required report when he or she obtains

---

fn. 4 ["'generally speaking, [we] follow dicta from the California Supreme Court'"]; *Aviles-Rodriguez v. Los Angeles Community College Dist.* (2017) 14 Cal.App.5th 981, 990 ["'To say that dicta are not controlling [citation] does not mean that they are to be ignored; on the contrary, dicta are often followed.'"].)

information indicating child abuse, but also the reporter's failure to take reasonable steps to discover the information that could have caused the reporter to suspect such abuse. (See *Williams v. Garcetti* (1993) 5 Cal.4th 561, 573 ["[i]n the criminal context, 'ordinary negligence sufficient for recovery in a civil action will not suffice; to constitute a criminal act the defendant's conduct must go beyond that required for civil liability and must amount to a "gross" or "culpable" departure from the required standard of care'"].)

In her reply brief, Doe argues that, even if reasonable suspicion is based on facts known to District employees, "given the open nature of the grooming and abuse [Doe] was subjected to . . . it is hard [to] understand how a single District employee did not 'entertain a suspicion' that [Farr's] behaviors were concerning." The problem for Doe is that she did not present admissible evidence that any District employees knew facts from which a reasonable person in a like position would have suspected Farr had sexually abused Doe. (See *Prue v. Brady Co./San Diego, Inc.* (2015) 242 Cal.App.4th 1367, 1375 [if the party moving for summary judgment "meets [its] initial burden of production, the burden then shifts to the opposing party to produce admissible evidence showing a triable issue of material fact exists"].)

Doe presented evidence that other students—not teachers or other District employees—witnessed Farr's conduct toward Doe. But the employees who supervised or otherwise worked with Farr on campus denied ever seeing Farr physically interact with Doe, tickle her, hug her, play with her hair, or even spend

41

time alone with her.[12] Nor was there evidence any school employee ever saw Doe wear Farr's jacket. And Doe did not present any evidence suggesting that the District employees' testimony was not credible or that other employees were present when Farr was engaging in grooming behavior toward Doe on campus. For example, no student testified Farr's physical interactions with Doe occurred in front of other teachers. Doe's assertion that a District employee must have entertained a reasonable suspicion is too speculative to create a triable issue of material fact on this cause of action. (See *Griffin v. The Haunted Hotel, Inc.* (2015) 242 Cal.App.4th 490, 507 ["testimony about what 'could be' is too speculative to create a triable issue"]; *Montague v. AMN Healthcare, Inc.* (2014) 223 Cal.App.4th 1515, 1525 ["speculative inferences do not raise a triable issue of fact"]; *Pacific Gas & Electric Co. v. City of Oakland* (2002) 103 Cal.App.4th 364, 371 ["'A party cannot avoid summary judgment based on mere speculation and conjecture [citation], but instead must produce admissible evidence raising a triable issue of fact.'"].)

---

[12] Farr's direct supervisor denied seeing most of the behavior the students observed, but she did recall Farr spent more time socializing with a group of girls that included Doe than Farr did with other students. Perhaps a prudent administrator would have taken further steps to supervise Farr's student interactions. But witnessing Farr frequently interact with Doe and a handful of other students, without more, did not give rise to a reasonable suspicion of "sexual abuse," as CANRA defines that term. (See Pen. Code, § 11165.1, subds. (a) & (b).)

42

## DISPOSITION

The judgment is reversed.  The trial court is directed to vacate its order granting the District's motion for summary judgment.  The trial court is directed to enter a new order denying the District's motion for summary judgment, denying the District's motion for summary adjudication on Doe's causes of action for negligence, and granting the District's motion for summary adjudication on Doe's cause of action for breach of the mandatory duty to report suspected child abuse.  Doe is to recover her costs on appeal.


SEGAL, J.


We concur:


PERLUSS, P. J.


FEUER, J.

43